# IN THE COURT OF APPEALS OF IOWA

No. 17-1975
Filed January 9, 2019

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**ROBIN INMAN,**
          Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano,

Judge.


The defendant appeals from her conviction for burglary in the first degree.

**AFFIRMED.**


Christopher R. Kemp of Kemp & Sease, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney

General, for appellee.


Considered by Potterfield, P.J., Doyle, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**POTTERFIELD, Presiding Judge.**

Robin Inman appeals from her conviction for burglary in the first degree. She maintains there is insufficient evidence to support her conviction, arguing there was not substantial evidence to support the jury's finding (1) she had the intent to commit an assault or theft at the time she entered the occupied structure or (2) she inflicted bodily injury while "in or upon" the occupied structure.

**I. Background Facts and Proceedings.**

Savu Cirligel is a Des Moines homeowner whose home was badly damaged in a fire. Cirligel and his family moved out of the home but left their possessions behind. Cirligel intended to repair the home and, ultimately, to move back. In April 2017, Cirligel noticed that his garage—where many of the family's valuables were being stored—was being broken into and items were being stolen. Local police were unable to assist Cirligel, so he decided he would spend some nights in the home in an attempt to catch any perpetrators in the act.

Cirligel stayed in the basement of the split-level home on April 10; he was armed with a handgun. He did not have a phone with him, and the home did not have electricity.

According to his testimony, Cirligel was waiting in one of the downstairs bedrooms when he heard someone walking around on the floor above him. He estimated it lasted for about five minutes before the person opened the basement door. He did not hear anyone speaking or calling out as they walked around upstairs. When the door opened, he saw a woman—Inman—wearing a "strong headlamp." Cirligel lifted the gun, and Inman began saying repeatedly, "Don't shoot me." Cirligel told the woman he was not going to shoot her and asked what

she was doing in his home. She responded that she had a boyfriend with a gun who was out in the backyard. Cirligel grabbed her by the arm with the intention of removing her from the home. At one point in his testimony, Cirligel stated, "[They] fought up on the stairs," but he also testified Inman did not struggle on the way outside.

After they got outside in the yard, Cirligel yelled for his neighbor to call 911. Inman—in an apparent attempt to break free from him—then began to fight with Cirligel. She used the scarf he was wearing to choke him and pull him to the ground. According to Cirligel, it was during the scuffle that he fired the gun and shot Inman. Inman fled to a nearby friend's home. Based on a separate 911 call, police and medical personnel were directed to the apartment of Inman's friend. They found Inman conscious and laying on her stomach; she had been shot in her lower back. She was transported to a local hospital, where she ultimately underwent surgery for the injury.

Officer Dao Meunsaveng spoke to Inman at the hospital. Inman told him she had been out walking when she realized she was being followed by someone—a person she thought was her former boyfriend. She said he "gave her the look" so she decided to flee. She told the officer she ran until she found a house and then she jumped the fence and hid in the backyard of the home. While she was there hiding, she was confronted by a male. As she was climbing back over the fence to meet a friend who was picking her up in a vehicle, she heard a pop and felt a burning sensation.

Detective Danny White spoke to Inman approximately ten days after the incident. Inman told him she walking from a friend's house to a local convenience

store to buy cigarettes when she noticed someone she believed to be her former boyfriend—who had been abusive—following her. After some discussion, Inman told Detective White that she was not sure the person had been the former boyfriend; "she thought it could be him in the way that he walked was like her ex-boyfriend but she was not positive that it was" him. She indicated she fled on foot and ultimately found a backyard with a shed that she hid behind. While hiding behind the shed, she saw an open window to the home and decided to enter. She climbed some barrels to get to a second-story deck and then entered the home through the window. Once she got inside, she walked around the house knocking on interior doors "to see if anybody is there" but also noted that the house appeared to be burnt. She then went downstairs, where she encountered Cirligel. According to Inman, she and Cirligel left the home, and while she was trying to flee from him, he shot her in the back. Crime scene investigators later recovered from Cirligel's yard a stun gun, a makeshift headlamp, and two gloves—one black glove and one camouflage glove.

Following a jury trial, Inman was convicted of burglary in the first degree. She was sentenced to a term of incarceration not to exceed twenty-five years.

Inman appeals.

## II. Standard of Review.

We review claims challenging the sufficiency of the evidence for correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). In our review, we "consider all the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* (citation omitted).

**III. Discussion.**

Here, the jury was instructed that in order to find Inman guilty of burglary in the first degree, the State had to prove the following beyond a reasonable doubt:

> 1. On or about the 10th day of April, 2017, [Inman] entered a residence at [address].
> 2. The residence was an occupied structure as defined in instruction No. 16.
> 3. [Inman] did not have permission or authority to enter the residence.
> 4. The residence was not open to the public.
> 5. One or more persons was present in the residence.
> 6. [Inman] did so with the intent to commit a theft.
> 7. In the course of the offense, [Inman] intentionally or recklessly inflicted bodily injury on Savu Cirligel.

Inman maintains there is not substantial evidence to support a finding that she intended to commit a theft at the time she entered the residence. She points to the fact that when she met Cirligel in the home, she was not holding or carrying any of the family's belongings and, in fact, Cirligel testified nothing was determined to be missing from the home. She maintains the gloves and headlamp she was wearing were not out of place, as it was not warm outside and she had been walking in the dark.

While Inman reported to the police that she was only in the home to hide from her former boyfriend, viewing the evidence in the light most favorable to the State, we must consider that Inman entered the home for a different purpose. "The element of intent is seldom susceptible to proof by direct evidence. Rather, proof of intent usually depends on circumstantial inferences and deductions as may be drawn from facts proved by evidence in accordance with common experience and observations." *State v. Kirchner*, 600 N.W.2d 330, 334 (Iowa 1999) (citation omitted). Here, Inman entered an apparently abandoned home through a window

after dark while wearing dark gloves and a headlamp. She walked around the first floor of the home slowly for a number of minutes; she did not yell out or ask for help during this time, undermining Inman's offered explanation for why she was in the home. "An intent to commit theft may be inferred from an actual breaking and entering of a building which contains things of value." *State v. Oetken*, 613 N.W.2d 679, 686 (Iowa 2000). The record contains substantial evidence to support the finding Inman entered the home with the intent to commit theft.

Next, Inman maintains there was not substantial evidence to support the jury's finding she committed an assault "in or upon" the occupied structure. *See State v. Pace*, 602 N.W.2d 764, 773 (Iowa 1999) (reversing a conviction of burglary in the first degree because "our statute defining first-degree burglary specifically requires the defendant to inflict the injury 'while perpetrating a burglary *in or upon an occupied structure* in which one or more persons are present'"). But Inman has not preserved error on this argument. She did not raise it in her motion for judgment of acquittal and she did not object to the jury instruction, which does not require the jury to find the assault occurred in or upon the structure. "Failure to timely object to instruction not only waives the right to assert error on appeal, but also 'the instruction, right or wrong, becomes the law of the case.'" *State v. Taggart*, 430 N.W.2d 423, 425 (Iowa 1988) (citation omitted).

Inman makes a blanket statement that if we find her claims were not preserved, we should consider them under the ineffective-assistance framework. However, Inman does not make an argument regarding ineffective assistance. *See Schreiber v. State*, 666 N.W.2d 127, 128 (Iowa 2003) (noting an issue could be deemed waived when the petitioners "allude to [the issue] in one sentence in

their appellate brief" and "do not present an argument on the issue"). Inman bears the burden to establish both that counsel breached an essential duty and that she suffered prejudice as a result. *See State v. Stewart*, 691 N.W.2d 747, 749 (Iowa 2004) ("The defendant bears the burden of demonstrating ineffective assistance."). "To reach the merits of this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume." *See Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974).

Although we cannot reach the merits on her ineffective-assistance claim, we preserve Inman's claim for a postconviction-relief action. *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018) ("If the development of the ineffective-assistance claims in the appellant brief was insufficient to allow it consideration, the court of appeals should not consider the claim, but it should not outright reject it.").

## IV. Conclusion.

Because substantial evidence supports the jury's finding that Inman entered the home with the intent to commit a theft, we affirm Inman's conviction for burglary in the first degree. Her claim there was insufficient evidence to support a finding she committed an assault "in or upon" the structure is not preserved for our review, and we cannot consider her alternative ineffective-assistance claim; we preserve it for a postconviction-relief action.

**AFFIRMED.**